Harry N. HUSBANDS et al., Plaintiffs,

v.

COMMONWEALTH OF PENNSYL-
VANIA et al., Defendants.

Civ. A. No. 72–1254.

United States District Court,

E. D. Pennsylvania.

May 22, 1973.

**926**

Donald J. Orlowsky, ReDavid, Orlowsky & Natale, Media, Pa., for plaintiffs.

James R. Adams, Harrisburg, Pa., for Commonwealth of Pa., Pittenger, Deming Lewis and Pennsylvania State Board of Education.

Lewis B. Beatty, Jr., Butler, Beatty, Greer & Johnson, Media, Pa., for Lambert and Delaware County Intermediate Board of School Directors.

Melvin G. Levy, Levy & Levy, Chester, Pa., for Grosse and Interim Operating Committee for Administrative Unit No. 4.

Clement J. McGovern, Jr., Fronefield, deFuria & Petrikin, Chester, Pa., for Clarence Roberts and Interim Operating Committee for Administrative Unit No. 12.

## OPINION AND ORDER

NEWCOMER, District Judge.

Presently before the Court is a motion to dismiss the complaint or to abstain filed by all the above captioned defendants except defendant, Franklin A. Yeager, President of Interim Operating Committee for Administrative Unit No. 5, and defendant, Interim Operating Committee for Administrative Unit No.

5. The instant action is brought under the Civil Rights Act of 1964, 42 U.S. C.A. § 1983, by parents individually and on behalf of their children attending public schools within three newly reorganized school districts in the County of Delaware, Commonwealth of Pennsylvania, i. e. Unit 4, Unit 5, and Unit 12. This action is also brought on behalf of all persons similarly situated. The plaintiffs charge that as a result of school district reorganization, they have been forced to attend schools within racially and economically segregated districts and they have been deprived of rights, privileges and immunities secured by the constitution and laws of the United States. Plaintiffs pray for an injunction, altering and revising, or ordering defendants to alter and revise the Delaware County School Reorganization Plan, declaratory relief as to the unconstitutionality of said plan in its present configuration, an injunction restraining the defendants from levying taxes without equalization of assessment ratios, and declaratory relief as to the unconstitutionality of public school financing which places substantial dependence upon local property taxes. The defendants have moved to dismiss the complaint or to abstain because (1) the plaintiffs' first cause of action fails to state a claim upon which relief can be granted, (2) the plaintiffs lack standing to raise the racial issues contained in the first cause of action, (3) there is no federal right to relief from "de facto" segregation, (4) the plaintiffs have failed to exhaust administrative remedies available under state law and thus should not have access to the Federal Courts, (5) the plaintiffs have failed to join necessary parties-defendant, (6) this Court is without proper jurisdiction to determine the merits of plaintiffs' fourth cause of action, (7) the action is barred by Res Judicata, (8) in the alternative, this Court should abstain, (9) the plaintiffs' complaint fails to allege any violation of any right, privilege, or immunity, protected or guaranteed by the Constitution or laws of the United States, (10) the plaintiffs' complaint fails to allege a Constitutionally prohibited state enforced system of racial segregation, (11) the plaintiffs' allegations of "economic discrimination" do not establish the violation of any right, privilege, or immunity protected by the Constitution or laws of the United States, and (12) the plaintiffs' complaint is barred by 28 U.S.C.A. § 1341.

On October 2, 1968, the Delaware County Board of School Directors, pursuant to Act 150 of 1968 (24 P.S. § 2400.1, et seq.) adopted a plan for reorganization of the school districts of Delaware County into 15 new districts. These new districts were reorganized as follows:

| Administrative Unit | Municipalities |
| --- | --- |
| 1 | Radnor |
| 2 | Haverford |
| 3 | Upper Darby |
| | Clifton Heights |
| | Millbourne |
| 4 | Lansdowne |
| | Aldan |
| | E. Lansdowne |
| | Darby |
| | Colwyn |
| | Yeadon |
| 5 | Collingdale |
| | Sharon Hill |
| | Folcroft |
| | Darby Twp. |
| 6 | Glenolden |
| | Prospect Park |
| | Norwood |
| | Tinicum |
| 7 | Ridley Twp. |
| | Ridley Park |
| | Eddystone |
| 8 | Springfield |
| | Morton |
| 9 | Marple |
| | Newtown |
| 10 | Edgmont |
| | Middletown |
| | Upper Providence |
| | Media |
| 11 | Nether-Providence |
| | Rose Valley |
| | Rutlege |
| | Swarthmore |
| 12 | Chester |
| | Chester Twp. |
| | Upland |
| 13 | Upper Chichester |
| | Lower Chichester |
| | Marcus Hook |
| | Trainer |
| 14 | Parkside |
| | Aston |
| | Brookhaven |
| 15 | Concord |
| | Bethel |
| | Chester Heights |

The total population, percentage of negro population, total student population, negro student population, and percentage of negro students in those municipalities were as follows:

| Administrative Unit | Municipalities | Total * Population | % * Negro | Total ** Students | Negro ** Students | % Negro |
|---|---|---|---|---|---|---|
| 1 | Radnor | 27,459 | 2.9(805) | 4,351 | 149 | 3.4 |
| 2 | Haverford | 55,132 | 1.6(908) | 7,813 | 152 | 1.9 |
| 3 | Upper Darby | 95,910 | 0.2(157) | | | |
| | Clifton Heights | 8,348 | 0.1(10) | | | |
| | Millbourne | 637 | 0 0 | | | |
| | | 104,835 | | 12,762 | 17 | 0.1 |
| 4 | Lansdowne | 14,090 | 3.2(453) | | | |
| | Aldan | 5,001 | 0.1(6) | 2,974 | 86 | 2.87 |
| | E. Lansdowne | 3,186 | 0 0 | | | |
| | Darby | 13,729 | 14.0(1918) | | | |
| | Colwyn | 3,169 | 0.1(4) | 2,534 | 473 | 18.2 |
| | Yeadon | 12,136 | 15.0(1816) | 1,276 | 431 | 33.77 |
| | | 51,311 | | 6,784 | 990 | 14.6 |
| 5 | Collingdale | 10,605 | 0.2(23) | 1,923 | 0 | 0 |
| | Sharon Hill | 7,464 | 1.3(94) | 1,554 | 2 | 0.1 |
| | Folcroft | 9,610 | 0.1(14) | 1,529 | 0 | |
| | Darby Twp. | 13,198 | 30.1(3972) | 1,792 | 1,284 | 71.59 |
| | | 40,877 | | 6,798 | 1,286 | 18.91 |
| 6 | Glenolden | 8,697 | 0.4(35) | | | |
| | Prospect Park | 7,250 | 0.5(36) | | | |
| | Norwood | 7,229 | 0.2(17) | | | |
| | Tinicum | 4,906 | 0.4(19) | | | |
| | | 28,082 | | 5,028 | 7 | 0.1 |
| 7 | Ridley Twp. | 39,085 | 2.0(781) | | | |
| | Ridley Park | 9,025 | 0.1(8) | | | |
| | Eddystone | 2,706 | 0.2(5) | | | |
| | | 50,816 | | 9,549 | 215 | 2.2 |
| 8 | Springfield | 29,006 | 0.1(26) | | | |
| | Morton | 2,602 | 26.7(695) | | | |
| | | 31,608 | | 5,546 | 229 | 4.0 |
| 9 | Marple | 25,040 | 0.3(76) | | | |
| | Newtown | 11,081 | 0.1(10) | | | |
| | | 36,121 | | 7,635 | 23 | 0.3 |
| 10 | Edgmont | 1,368 | 0.5(7) | | | |
| | Middletown | 12,878 | 2.4(305) | | | |
| | Upper Providence | 9,234 | 2.8(258) | | | |
| | Media | 6,444 | 14.7(947) | | | |
| | | 29,924 | | 6,080 | 374 | 6.0 |
| 11 | Nether-Prov. | 13,644 | 5.2(715) | | | |
| | Rose Valley | 821 | 0.2(2) | | | |
| | Rutlege | 1,167 | 0.6(7) | | | |
| | Swarthmore | 6,156 | 3.7(225) | | | |
| | | 21,788 | | 4,814 | 266 | 5.5 |
| 12 | Chester | 56,331 | 45.2(25,469) | 10,738 | 8,184 | 76.1 |
| | Chester Tw. | 5,708 | 32.7(1,867) | 820 | 464 | 56.5 |
| | Upland | 3,930 | 0.6(24) | 630 | 3 | 0.4 |
| | | 65,969 | | 12,188 | 8,651 | 70.9 |

| Administrative Unit | Municipalities | Total * Population | % * Negro | Total ** Students | Negro ** Students | % Negro |
|---|---|---|---|---|---|---|
| 13 | Upper Chichester | 11,414 | 7.9(897) | | | |
| | Lower Chichester | 4,009 | 2.7(110) | | | |
| | Marcus Hook | 3,041 | 2.5(76) | | | |
| | Trainer | 2,336 | 3.8(88) | | | |
| | | 20,800 | | 4,823 | 383 | 8.0 |
| 14 | Parkside | 2,343 | 0 | | | |
| | Aston | 13,704 | 0.4(49) | | | |
| | Brookhaven | 7,370 | 0.5(35) | | | |
| | | 23,417 | | 5,741 | 3 | 0.05 |
| 15 | Concord | 4,592 | 4.4(200) | | | |
| | Bethel | 2,034 | 0 | | | |
| | Chester Heights | 1,277 | 2.5(15) | | | |
| | | 7,903 | | 1,967 | 13 | 0.6 |
| Delaware County Totals | | 596,102 *** | 7.3 | 101,879 | 12,578 | 12.6 |

* Taken from 1970 Census Reports

** Taken from "A Summary of Enrollments in Public Schools of Pennsylvania, Fall 1971"

*** Does not include Birmingham and Thornbury Townships, which are included in Chester County School Districts

———◆———

Under the reorganization plan, thirteen former school districts were reorganized into three new school districts, i. e. Unit 4, Unit 5, and Unit 12. These three units contained 80% of the entire black population of Delaware County, and 87% of the black student population of Delaware County. These units are allegedly composed of former school districts which had the poorest tax base in the County.

## I. PLAINTIFFS' COMPLAINT DOES STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

■ Several defendants in their motion to dismiss contend that the Complaint fails to state a claim upon which relief can be granted. A complaint need only set out a generalized statement of the facts which will give fair notice of the action. The Federal Rules of Civil Procedure do not require the claimant to plead in detail the facts upon which he bases his claim. Conley v. Gibson, 355 U.S. 41, 47–48, 78 S.Ct. 99, 2 L.Ed. 2d 80 (1957).

■■ In considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court will consider as admitted, viewing the same in the light most favorable to plaintiff, all facts contained in the complaint and every inference fairly deducible therefrom. Melo-Sonics Corporation v. Cropp, 342 F.2d 856, 858–859 (3rd Cir. 1965). A complaint should not be dismissed unless it appears to a certainty that the plaintiff would not be entitled to relief under any set of facts which could be proved in support of his claim. Frederick Hart & Co. v. Recordgraph Corp., 169 F.2d 580, 581 (3rd Cir. 1953); Jenkins v. McKeithen, 395 U.S. 411, 421–422, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1963).

■ A case brought under the Civil Rights Act of 1964 should not be dismissed at the pleading stage unless it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of his claim. Holmes v. New York Housing Authority, 398 F.2d 262, 265 (2d Cir. 1968), citing Barnes v. Merritt, 376 F.2d 8, 11 (5th Cir. 1967).

## II. THE FIRST CAUSE OF ACTION ALLEGES THAT THE DELAWARE COUNTY PLAN OF SCHOOL REORGANIZATION CREATES SEVERE RACIAL IMBALANCE AND THE IMPLE-

MENTATION OF SAID PLAN AL-LEGEDLY CONSTITUTES DE JURE SEGREGATION AND IS THEREFORE ACTIONABLE UNDER 42 U.S.C.A. § 1983

Paragraphs 27 through 32 of the plaintiffs' Complaint set forth allegations which constitute a denial of the equal protection of the laws of the United States and a breach of 42 U.S.C.A. § 1983.[1] Paragraphs 27 through 32 read as follows:

27. Defendants by preparing and adopting plans for reorganization resulting in the formation of Administrative Units 4, 5, and 12 have encouraged and compelled the formation of racially identifiable school districts which contain blacks in separate schools and build upon and promote racial patterns.

28. Defendant State Board by approving defendant County Board's said plans for reorganization have encouraged and compelled the formation of school districts which concentrate and contain blacks in one school district and whites in the other school districts so as to create racially identifiable school districts.

29. Defendant County Board and Defendant State Board in establishing Administrative Units Nos. 4, 5 and 12 and the adjoining Administrative Units have erected Administrative Units not only to segregate Administrative Units Nos. 4, 5 and 12, but the adjoining Administrative Units as well.

30. The formation of Administrative Units Nos. 4, 5 and 12 encourages and fosters a population movement of whites out of such Administrative Units and promotes the containment of blacks within the area of such Administrative Units.

31. The actions of Defendants, especially in light of the available alternatives in establishing the above segregated and racially identifiable school districts are unconstitutional in that they are in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §§ 1981, 1983 and are supported by no compelling state interest.

32. Because of the allegations described in paragraphs 7 to 31 inclusive of this cause of action, plaintiffs will suffer immediate and irreparable injury for which there is no adequate remedy at law.

In Stringer v. Dilger, 313 F.2d 536, 540 (1963), the Court held that "The statutory prerequisites to liability under 42 U.S.C. § 1983 are: (1) that the defendant act 'under color of' state or local law, and (2) that the plaintiff be subjected to a 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" There is no doubt that the defendants herein acted "under color of state law." The Complaint states that in adopting the plan, the Delaware County Board of School Directors acted pursuant to Act 150 of 1968 and that said plan was thereafter approved by the defendant, Pennsylvania State Board of Education. Nor do the defendants raise the objection that the requisite state action is here lacking. Rather, the defendants have raised the objection that plaintiffs have charged no more than de facto segregation and that such a claim does not entitle them to relief. To be sure, there is a well-worn distinction which the courts have drawn between de jure and de facto segregation. In Swann v. Charlotte-Mecklenberg, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), the United States

---

1. Title 42, U.S.C.A., Section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Supreme Court defined de facto segregation as that occurring "where racial imbalance exists in the schools but with no showing that this was brought about by discriminatory action of state authorities." The defendants seek to characterize the present case along these lines, yet the precedents from which they draw belie the comparison. In Spencer v. Kugler, 326 F.Supp. 1235 (D.N.J., 1971), which the defendants say is similar to the instant case, the Court passed on the constitutionality of N.J. 18A:8–1, which essentially stated that "Each municipality shall be a separate local school district . . . ." In upholding the statute, the Court said:

It is clear that these legislative enactments prescribe school district boundaries in conformity with municipal boundaries. This designation of school district zones is therefore based on the geographic limitations of the various municipalities throughout the State. Nowhere in the drawing of school district lines are considerations of race, creed, color or national origin made . . . any purported racial imbalance results from an imbalance in the population of that municipality-school district. *Spencer,* at 1240.

The defendants cite Bell v. School District of the City of Gary, Indiana, 324 F.2d 209 (7th Cir. 1963), which was based on similar facts. However, it is clear that the racial imbalance complained of in the instant case resulted not from geographic limitations nor from municipal boundaries. With the implementation of the Delaware County Plan, it is no longer relevant to speak in terms of municipality-school districts. We now are concerned with consolidated districts, which transcend municipal boundaries. Having shed the concept of the municipality-school district, the defendant's actions cannot be tested against the *Spencer* rationale. The defendants themselves formulated the boundaries of these school districts. Allegedly therefore, they effected consolidation in such a manner as to perpetuate existing patterns of segregation.

The case of Keyes v. School District, 313 F.Supp. 61, 73 (D.Colo., 1970), enunciated the elements of de jure segregation as follows:

(1) The State, or more specifically, the school administration, must have taken some action with a purpose to segregate;

(2) This action must have in fact created or aggravated segregation at the school or schools in question;

(3) A current condition of segregation must exist; and

(4) There must be a causal connection between the acts of the school administration complained of and the current condition of segregation.

"In order to satisfy this element of purpose, the intent to segregate need not be the sole motive for a school district's action; it need only be one of several factors which motivated the school administration." *Keyes,* at 74. Moreover, such intent may be proved from the surrounding circumstances. In *Keyes,* the Court noted that the effect of the Board's various acts was merely to isolate and concentrate Negro students in those schools which were already segregated while maintaining the integrity of the white schools and concluded that "the School Board knew the consequences and intended or at least approved of the resultant racial concentrations." *Keyes,* at 65.

In the instant case it can hardly be contended that the Delaware County Board and Pennsylvania State Board were not aware of the racial composition of the constituent districts which they undertook to reorganize under Act 150. The standards for approval of administrative units promulgated by the State Board of Education clearly stated that race should not be a factor in determining unit boundaries. Yet the plan which resulted placed black districts together with other black districts and white districts with white districts. A startling illustration in connection with this allegation is the City of Chester and Chester Township. The City of Chester,

with a black student population of 76.1% was consolidated with Chester Township, which has a black student population of 56.5%. Adjacent Penn-Delco school district was left 100% white. Such massive disparities may indicate that race was a factor in the realignment. The plaintiffs argue that it is inconceivable that such a result could have been reached by random selection. Even under the strict test laid down in *Keyes*, supra, the intent to segregate might be inferred from the end result—for the end result in Deleware County is arguably a system of segregated schools.

Other cases have held segregation actionable even in the absence of any plan or design to segregate.

> Equal protection of the laws means more than merely the absence of governmental action designed to discriminate . . . we now firmly recognize that the arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and public interest as the perversity of a willful scheme. Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920, 931 (2d Cir., 1968); Hobson v. Hansen, 269 F.Supp. 401, 497 (D.D.C. 1967).

The defendants state that they have not created segregated districts from integrated districts. The plaintiffs argue that having undertaken to realign the various school districts within the County, it was at the very least incumbent upon the defendants not to aggravate existing segregation. In Taylor v. Board of Education of City School District of New Rochelle, 294 F.2d 36, 39 (2d Cir., 1961) cert. denied, 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961), the Supreme Court struck down school districting upon a finding that "the Board's acceleration of segregation at Lincoln [school] up to 1949 and its actions since then amounting to a perpetuation and a freezing in of this condition negate the argument that the present situation in Lincoln School is only the 'chance' or 'inevitable' result of applying a neighborhood school policy to a community where residential patterns show a racial imbalance. Rather they make it clear that the Board considered Lincoln as the 'Negro' school and that district lines were drawn and retained so as to perpetuate this condition. In short, race was made the basis for school districting, with the purpose and effect of producing a substantially segregated school. This conduct clearly violates the Fourteenth Amendment. . . ."

The defendants object that "plaintiffs have averred, at best, segregation which exists innocently as a result of population and geography and not by virtue of state action." The plaintiffs contend that nowhere does segregation exist "innocently." Moreover, under the instant facts, segregation has allegedly been sanctioned and approved by the state. This Complaint, therefore, has thereby come within the purview of the Fourteenth Amendment and of 42 U.S.C.A. § 1983. As the Court stated in Brewer v. School Board of City of Norfolk, Virginia, 397 F.2d 37, 41 (4th Cir. 1968): "If residential racial discrimination exists, it is immaterial that it results from private action. The school board cannot build its exclusionary attendance area upon private racial discrimination. Assignment of pupils to neighborhood schools is a sound concept, but it cannot be approved if residence in a neighborhood is denied to Negro pupils solely on the ground of color."

Under these circumstances it is clear that the plaintiffs' first cause of action does state facts which constitute the essential elements of de jure segregation. They allege that the defendants did, purposefully or through gross thoughtlessness, so draft the reorganization as to perpetuate and compound existing imbalances and to give formal sanction thereto. The Fourteenth Amendment of the United States Constitution, as interpreted through the cases, mandates that this Court will sit to hear such charges:

> The constant theme and thrust of every holding from Brown I to date is that state-enforced separation of the

races in public schools is discrimination that violates the Equal Protection Clause. The remedy commanded was to dismantle dual school systems. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

## III. THE PLAINTIFFS DO NOT LACK STANDING TO RAISE THE RACIAL ISSUES CONTAINED IN THE FIRST CAUSE OF ACTION

■ The defendants additionally contend that even if the first cause of action does state a claim upon which relief can be granted, still the plaintiffs lack standing to raise the racial issues contained therein. The defendants object on the basis that the plaintiffs are identified only by name and address, not race. The defendants argue that the plaintiffs are not themselves alleged to be blacks, and if, in fact, they are not blacks, they lack the requisite personal stake in the controversy. The plaintiffs' rebuttal to this argument is that even if the plaintiffs are not themselves black, it must be remembered that they are only named plaintiffs who purport to represent a class of citizens and taxpayers, black and white, in excess of 50,000. The plaintiffs' argument continues that if the propriety of the class is upheld, the requisite standing is present. With this statement, we do not agree. This Court recently held "It is a fundamental principle of law that a plaintiff must demonstrate injury to himself by the parties whom he sues before the plaintiff can successfully state a cause of action. This principle is found in Article III, Section 2, Clause 1 of the Constitution which restricts judicial power to 'cases' and 'controversies.'" (citations omitted) Weiner v. Bank of King of Prussia, 358 F.Supp. 684, 6 (E.D.Pa., 1973, Newcomer, J.). This Court further held that "A plaintiff may not use the procedural device of a class action to boot strap himself into standing he lacks under the express terms of the substantive law. It must be noted that the question of

standing is totally separate and distinct from the question of plaintiff's right to represent a purported class under Rule 23. While standing to sue is an essential prerequisite · to maintaining an action, whether in one's own right or as a representative of a class, the issues are not convertible. Standing to sue is an essential threshold which must be crossed before any determination as to class representation under Rule 23 can be made. Without standing, one cannot represent a class. . . ." Weiner v. Bank of King of Prussia, supra.

■ The plaintiffs concede the general proposition that to secure federal relief from a statute or other governmental action on the ground of unconstitutionality, it is necessary that the plaintiff allege that he has sustained or will sustain injury therefrom. Yet this Court would be mistaken were we to attempt to forge this rule of practice into an immutable · legal axiom. The courts have been seen to relax the requirement of standing when the circumstances of the case so require. This is especially true in the area of civil rights. In Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953), the court permitted a white plaintiff to assert a denial of the rights of black persons in defense to an action for breach of a restrictive covenant: "Under the peculiar circumstances of this case, we believe the reasons which underlie our rule denying standing to raise another's rights, which is only a rule of practice, are outweighed by the need to protect the fundamental rights which would be denied by permitting the damages action to be maintained." See also Sullivan v. Little Hunting Park, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969), wherein a white lessor of a membership interest in a community playground sued under 42 U.S.C.A. § 1982, the Fair Housing Title of the Civil Rights Act, and was expelled from the organization for advocating the rights of his black lessee. The court, in *Sullivan*, in overturning the expulsion, echoed the *Barrows* decision, in stating that "the white owner is at times

'the only effective adversary' of the unlawful restrictive covenant" 396 U.S. at 237, 90 S.Ct. at 404. Therefore, these plaintiffs are not precluded from bringing this suit, though the issues be raised by white plaintiffs in behalf of blacks who are not joined herein.

## IV. THE SECOND CAUSE OF ACTION ALLEGES THAT THE DELAWARE COUNTY PLAN OF SCHOOL REORGANIZATION CREATES SEVERE ECONOMIC IMBALANCE, THUS DENYING PLAINTIFFS' EQUAL EDUCATIONAL OPPORTUNITIES, AND SUCH CONDUCT IS ACTIONABLE UNDER 42 U.S.C.A. 1983

 Paragraphs 33 through and including 37 of plaintiffs' complaint allege that by preparation and adoption of the aforementioned plans for reorganization, the defendants have created educationally deprived school districts, which operate to deny plaintiffs' equal educational opportunities and are thus violative of the Equal Protection Clause. A cause of action is thereby stated. Even assuming we are dealing only with de facto segregation, still the defendants are under an absolute duty to provide equal educational opportunities to all students.

The present state of the law is that separate educational facilities (of the de facto variety) may be maintained, but a fundamental and absolute requisite is that these shall be equal. Once it is found that these separate facilities are unequal in the quality of education provided, there arises a substantial probability that a constitutional violation exists. This probability becomes more conclusive where minority groups are relegated to inferior schools. . . . Keyes, supra, 313 F.Supp. at 82.

 While a school board may not be constitutionally required to integrate schools which become segregated because of the effect of housing patterns, where the schools are not integrated, the separate-but-equal doctrine will be rigorously applied to insure the equality of

the black student's educational experience. Hawkins v. Town of Shaw, Mississippi, 437 F.2d 1286 (5th Cir. 1971).

## V. THE FOURTH CAUSE OF ACTION ALLEGES THAT THE METHOD OF SCHOOL FINANCING EMPLOYED BY DEFENDANTS, WITH ITS SUBSTANTIAL DEPENDENCE ON LOCAL PROPERTY TAXES, CREATES INVIDIOUS DISCRIMINATION AND THIS METHOD OF SCHOOL TAXATION IS ACTIONABLE UNDER 42 U.S.C.A. § 1983

At the time the plaintiffs filed this case, i. e. June 27, 1972, and at the time the plaintiffs filed their brief in opposition to the motions to dismiss and abstain, i. e. February 2, 1973, the case of Rodriguez v. San Antonio Independent School District, 337 F.Supp. 280 (W.D. Texas 1971), had been appealed to the United States Supreme Court on June 6, 1972, under Docket No. 71–1332, 40 U.S.L.W. 3573. The *Rodriguez* case was argued before the United States Supreme Court on October 12, 1972, and decided on March 21, 1973. San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). The Supreme Court decision went against the plaintiff's contention in this instant case and held that the real estate financing system of school districts do not impinge on any fundamental rights since education is not a right afforded explicit or implicit protection under the Constitution, and since even assuming that some identifiable quantum of education was a Constitutionally protected prerequisite to the meaningful exercise of the right of free speech and the right to vote; nevertheless, the real estate tax system did not deny educational opportunities to any child, and there was no showing, in the *Rodriguez* case, that the system failed to provide an adequate education for all children. The United States Supreme Court further held that the traditional standard of review under the Equal Protection Clause, requiring a showing that

the state's action had a rational relationship to legitimate state purposes, was applicable particularly in view of the Court's traditional deference to state legislatures in the areas of fiscal and educational policies and local taxation, and in view of the great potential impact the *Rodriguez* case would have on the principles of federalism. Under the traditional equal protection test, the Texas financing system, an ad valorem tax by each school district on property within the district to supplement educational funds received by each district from the state, despite its conceded imperfections, rationally furthered a legitimate state purpose, and thus did not violate the equal protection clause, since the system, by its provision for state contributions to each district, assured a basic education for every child, while permitting and encouraging vital local participation and control of the school system through district taxation, and since the system, which was similar to systems employed in virtually every other state, was not the product of purposeful discrimination against any class, but instead was a responsible attempt to arrive at practical and workable solutions to educational problems.

Therefore, the defendants' motions to dismiss as they relate to the fourth cause of action of the plaintiffs' complaint will be granted.

## VI. THIS COURT DOES HAVE JURISDICTION OVER THE SUBJECT MATTER OF THE THIRD CAUSE OF ACTION

The defendants raise the further objection that this Court lacks jurisdiction to decide the questions raised under the Third Cause of Action. The Third Cause of Action alleges that:

### THIRD CAUSE OF ACTION

38. Defendants, Interim Operating Committees for Administrative Units 4, 5 and 12 have proposed a uniform tax millage rate to apply throughout each unit despite the fact that the assessment ratios applicable in the various component school districts are unequal.

39. Because of the lack of uniformity of assessment ratios in the Administrative Units in question, the levying of a uniform tax millage in each reorganized school district will result in the imposition of an arbitrary, discriminatory and unreasonable higher proportionate school real estate tax payment by plaintiffs and all similar plaintiffs. The repeal of Pennsylvania Act No. 154 of July 8, 1970 (24 P.S. § 6–672.1) as it applies to school districts covering more than one municipality removed the only available remedy for equalization of school taxes.

40. Because of the imposition of tax rates based on patently unequal assessment ratios, plaintiffs and all other similarly situated will be deprived of their right to equal protection of the laws under the 14th Amendment of the United States Constitution, all of which will cause plaintiffs to suffer immediate and irreparable injury for which there is no adequate remedy at law.

The defendants' objection is two pronged. First, the defendants contend that 28 U.S.C.A. § 1341 provides that "The district court shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." The defendants contend that such a plain, speedy, and efficient remedy is provided under Pennsylvania law, wherein an aggrieved taxpayer may petition for review and revision of his assessment, with a further right to appeal to the State Courts. However, it is obvious that nowhere in the administrative scheme is there provided a means by which a taxpayer may challenge the constitutionality of the tax itself. The Board of Assessment is neither equipped nor empowered to entertain such questions. The only remedy is with the courts. The defendants state that Pennsylvania has provided a system whereby a complaint by a taxpayer as to lack of

uniformity of property assessments will be reviewed by the County Board of Assessment and Revision of Taxes, then the Court of Common Pleas, and ultimately the Commonwealth Court. This Court notes that the Third Cause of Action is not founded in alleged discrepancies in individual assessments. Rather, the plaintiffs contend that assessment ratios vary largely among the various component districts within each unit. It is the application of a uniform millage rate upon these divergent assessment ratios which allegedly violates the Fourteenth Amendment. Plaintiffs pray not for a review of individual assessments, which would offer a piecemeal solution at best, but for the application of differential millage rates within each new unit, commensurate with the prevailing assessment ratios within each component district. The aforementioned administrative remedies do not comprehend the relief sought.

Secondly, the defendants alternatively urge that the Court lacks jurisdiction to hear the Third Cause of Action under 28 U.S.C.A. 2281:

> An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of any order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of unconstitutionality of such statute unless the application thereof is heard and determined by a district court of three judges under section 2284 of this title.

The plaintiffs' complaint makes no application for a three-judge court. The defendants argue that this is a fatal defect in the pleading. This issue was answered in Bell v. Waterfront Commission of New York Harbor, 279 F.2d 853 (2d Cir. 1960). The District Court in

*Bell* had reasoned that since the plaintiff had made no application for a three-judge court under § 2281, that the court was without jurisdiction to pass upon the constitutionality of the Waterfront Commission Act. Bell v. Waterfront Comm., 183 F.Supp. 175 (D.C. 1960). In overturning this aspect of the decision, the Circuit Court stated that "If, in fact, the complaint had set forth a substantial claim of 'unconstitutionality' as used in § 2281, requiring adjudication by a court of three judges, the district judge would not have been warranted in dismissing because plaintiff had not applied for such a court." *Bell*, at 279 F.2d 856, 857.

§ 2284 directs that in any action 'required by Act of Congress' to be so heard and determined, the district judge 'on the filing of the application' shall immediately notify the chief judge of the circuit who shall then designate two other judges to serve as members of the court. The 'application' referred to is 'the application for injunction or other relief' described in the preceding sentence of § 2284(1), not an application for the convening of a court of three judges. This construction finds support in the statement of the Eighth Circuit that 'there is no requirement in § 2284 that the applicant for the injunction must determine the need for a three-judge court and make request therefor.' *Id.*, at 857, citing Aaron v. Cooper, 261 F. 2d 97, 105 (8th Cir. 1958).

■ While the Court will not dismiss this complaint because of the plaintiffs' failure to request a three-judge court, the Court notes that the plaintiffs have prayed for an injunction to "restrain and enjoin the defendant, Interim Operating Committees, from levying any taxes without an equalization of assessment ratios." See plaintiffs' complaint, Section XIII, ¶ F. Therefore, this Court will make application to the Chief Judge of the Circuit for the designation of a three-judge court.

## VII. ALL PARTIES NECESSARY TO A DISPOSITION OF THE QUESTIONS RAISED HEREIN HAVE BEEN JOINED AS DEFENDANTS

The defendants contend that the complaint must be dismissed under Rule 19 (a) of the Federal Rules of Civil Procedure, for failure to join certain necessary parties. Under Rule 19(a):

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

For the reasons stated in VI supra, the plaintiffs believe that the County Board of Assessors is necessary neither as a party in interest, nor as a party without whose joinder complete relief is unavailable. The complaint does not seek equalization of assessment ratios by the County Board of Assessors. Rather, the complaint seeks the adjustment of tax millage rates in each community to compensate for the unequal assessment. This function lies within the province of the defendant school units and not with the County Board of Assessors.

The defendants, however, argue additionally that the relief requested by plaintiffs will affect school districts other than those comprising Units 4, 5 and 12, and that these are necessary parties under Federal Rule of Civil Procedure 19 (a)(2). The crucial question is whether these other school districts do, in fact, "claim an interest relating to the subject of the action." There is little doubt that these school districts may be affected by the results of this action. However, this does not mean that they necessarily have rights cognizable under Federal Rule of Civil Procedure 19(a)(2). The school district boundaries resulted solely from the plan which the plaintiffs in this action seek to invalidate. The districts played no direct role in their formation and they have no proprietary or possessory rights therein. Nor would the absence of these districts prevent this court from awarding complete relief under Federal Rule of Civil Procedure 19 (a)(1). The power to alter school district boundaries resides entirely with the Commonwealth of Pennsylvania, the Pennsylvania State Board of Education, and the Delaware County Intermediate Board of School Directors.

Moreover, Rule 24 of the Federal Rules of Civil Procedure would permit the other school districts to intervene if, in fact, they have sufficient interest in this action. The defendants, Clarence Roberts and Interim Operating Committee for Administrative Unit 12 raise the additional objection that plaintiffs have failed to join the Chester-Upland School District, which is the successor to the aforementioned defendants, having come into existence on July 1, 1972. The plaintiffs note this objection, and request leave to amend their complaint accordingly. Such leave will be granted.

## VIII. THIS COURT WILL NOT ABSTAIN FROM DECIDING THE QUESTIONS RAISED THEREIN

The defendants urge that this case is suitable for the application of the abstention doctrine, under which the federal courts reserve discretion to abstain from exercising their jurisdiction where the circumstances so warrant. This is not, however, a proper case for abstention. As the court stated in *Spencer*, supra, 326 F.Supp. at 1238:

The power to abstain is one residing in the sound discretion of the Court. In a civil suit attacking a state

statute on federal constitutional grounds the federal court should hear and decide the case unless the statute is fairly subject to an interpretation which will avoid or modify the federal constitutional question. [citations omitted].

In Holmes v. New York City Housing Authority, 398 F.2d 262, 265–266 (2d Cir., 1968), the Court rejected the application of the doctrine of abstention specifically in an action brought under the Civil Rights Act:

> At least in actions under the Civil Rights Act the power of a federal court to abstain from hearing and deciding the merits of claims properly brought before it is a closely restricted one which may be invoked only in a narrowly limited set of 'special circumstances' . . . [citations omitted]. In enacting the predecessor to § 1983 Congress early established the federal courts as the primary forum for the vindication of federal rights, and imposed a duty upon them to give 'due respect' to a suitor's choice of that forum. [citations omitted]. As a consequence it is now widely recognized that 'cases involving vital questions of civil rights are the least likely candidates for abstention [citations omitted].'

A determination of the federal constitutional questions raised by the subject action is fundamental to the disposition thereof. Moreover, since this action is brought under the Civil Rights Act, a long line of authority would militate against the application of the doctrine of abstention in the absence of "special circumstances." No such special circumstances have been shown by the defendants to exist herein. By reason of the foregoing, the plaintiffs contend that this court should exercise its discretion to determine the merits of this cause. With this, we agree.

## IX. THIS ACTION IS NOT BARRED BY RES JUDICATA

The defendants each devote considerable portions of their respective briefs to the discussion of res judicata as a bar to the instant action. This argument is premature. Federal Rule of Civil Procedure 12(b) provides as follows:

> Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter, (2) lack of jurisdiction over the person, (3) improper venue, (4) insufficiency of process, (5) insufficiency of service of process, (6) failure to state a claim upon which relief can be granted, (7) failure to join a party under Rule 19.

Federal Rule of Civil Procedure 8(c) states:

> In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence . . . res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense.

■ It is apparent under the rules that the plea of res judicata does not test the sufficiency of the pleadings but seeks to avoid a cause of action once stated. This conforms to common usage and practice. In order to make a determination as to the availability of res judicata, this court must necessarily look beyond the plaintiffs' pleadings to matters not of record herein. If the defendants contend that this action is barred by a prior adjudication on the merits, they will have ample opportunity to prove this contention later on.

The counsel for defendants, Clarence Roberts and Interim Operating Committee of Administrative Unit 12, however, has framed the res judicata argument in a context more befitting a motion to dismiss. These defendants maintain that the same issues raised in the instant ac-

tion were raised and decided in Cleary v. Dalton, No. 13358 of 1971, Delaware County, and this Court is without jurisdiction to review the decision of the Court of Common Pleas of Delaware County.

The plaintiffs argue that first of all it should be noted that this instant action, like *Cleary*, has been brought by parents, individually and on behalf of their children attending public schools within the three subject school districts. The named plaintiffs are allegedly different in each action, but assuming arguendo that they are rendered identical by virtue of the class action aspect of the complaint, the plaintiffs argue that a careful reading of Judge Bloom's opinion in *Cleary*, at 17, shows that Judge Bloom made no finding on the merits of plaintiffs' allegations of racial segregation. Regrettably, Judge Bloom's opinion was not included in the pleadings of this action, and therefore this Court is without the benefit of what he had to say. The plaintiffs allege that Judge Bloom held that the issue had been resolved by prior litigation, although the only question decided under these cases was that Act 150 is constitutional. Plaintiffs argue that they are entitled to a long overdue decision on the merits of the First Cause of Action. Furthermore, it is argued that the *Cleary* decision is devoid of any reference to economic segregation, alleged in the Second Cause of Action herein. In fact, so say the plaintiffs, no decision upon the merits of any of these allegations has ever been made in any action wherein these plaintiffs or those in priority with them were parties. Moreover, the defendant, Commonwealth of Pennsylvania, was not joined as a party defendant in the *Cleary* case. Therefore, argue the plaintiffs, this action can hardly be said to be tantamount to an appeal from the Court of Common Pleas of Delaware County.

The action herein is brought pursuant to 42 U.S.C.A. § 1983. Furthermore, the plaintiffs contend that counsel for the defendant, Delaware County Intermediate Board of School Directors, asserted in his brief in the *Cleary* case:

Plaintiffs have also pled and argued violations of the Federal Civil Rights Act. Such cause of action if there be one must necessarily be brought in the Federal Court which is given original jurisdiction in such matters, 28 U.S.C.A. § 1343(3) and (4), at 12.

The plaintiffs further point out that Judge Bloom in his opinion in Cleary, took the position that federal civil rights violations would have to be prosecuted in federal court. The plaintiffs argue that this was Judge Bloom's position because his opinion did not discuss any violations with reference to the Civil Rights Act.

The Court has decided to tread softly with reference to the plaintiffs' argument as to what is or is not in Judge Bloom's opinion, and what was or was not said by counsel for the Delaware County Intermediate Board of School Directors in his brief in the *Cleary* case. This Court believes it sufficient to say that the affirmative defense of res judicata should more properly be pled in a Rule 8 setting than in a Rule 12 setting. Therefore, this Court will not dismiss this action at this time, but rather will allow the res judicata defense to be raised at another, more proper stage of these proceedings.

## X. CONCLUSION

The plaintiffs have pled several matters long ripe for adjudication. This Court possesses jurisdiction over the subject matter of the complaint, and each of plaintiffs' claims for relief are within the cognizance of this Court. Therefore, the Court will grant the defendants' motions to dismiss only as to Count IV of the complaint.